46

DOYLE, APPELLEE, *v.* OHIO BUREAU OF MOTOR VEHICLES, APPELLANT.

[Cite as Doyle *v.* Ohio Bur. of Motor Vehicles (1990), 51 Ohio St. 3d 46.]

(No. 89-497—Submitted March 13, 1990—Decided May 9, 1990.)

*Myron A. Wolf* and *Fred Miller,* for appellee.

*Anthony J. Celebrezze, Jr.,* attorney general, *Cordelia A. Glenn* and *Cheryl D. Minsterman,* for appellant.

ALICE ROBIE RESNICK, J. The issue before this court is whether Ohio Adm. Code 4501:1-1-16(B)(1) violates the due course of law provision of Section 16, Article I of the Ohio Constitution. Our determination of this issue also requires an examination of R.C. 4507.08(A). We are cognizant that "[a]n enactment of the General Assembly is presumed to be constitutional, and before a court may declare it unconstitutional it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible." *State, ex rel. Dickman,* v. *Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E. 2d 59, paragraph one of the syllabus. See, also, *Rocky River* v. *State Emp. Relations Bd.* (1989), 43 Ohio St. 3d 1, 10, 539 N.E. 2d 103, 111 (long-established principle requiring courts to presume the constitutionality of legislative enactments); *State* v. *Young* (1988), 37 Ohio St. 3d 249, 251, 525 N.E. 2d 1363, 1367 (all legislative enactments enjoy a strong presumption of constitutionality); *State* v. *Stambaugh* (1987), 34 Ohio St. 3d 34, 35, 517 N.E. 2d 526, 527 (doubts regarding the validity of a statute are to be resolved in favor of the statute); *State, ex rel. Swetland,* v. *Kinney* (1982), 69 Ohio St. 2d 567, 23 O.O. 3d 479, 433 N.E. 2d 217.

It should be noted that neither the trial court nor the court of appeals held that R.C. 4507.08 is unconstitutional. Furthermore, appellee does not contend that this statutory provision is constitutionally infirm. R.C. 4507.08 provides in pertinent part:

"No temporary instruction permit or driver's license shall be issued to, or retained by:

"(A) Any person who is an *alcoholic,* or is addicted to the use of controlled substances to the extent that the use constitutes an impairment to the person's ability to operate a motor vehicle with the required degree of safety[.]" (Emphasis added.)

The General Assembly did not define the term "alcoholic" in R.C. 4507.08. However, Ohio Adm. Code 4501:1-1-16(B) defines the term "alcoholic" as follows: " 'Alcoholic' shall be defined as any person who: (1) Is convicted three or more times within the immediately preceding three-year period of driving under the influence of intoxicating liquor * * *[.]' "

I

We begin our analysis of Ohio Adm. Code 4501:1-1-16(B)(1) by examining the authority of the appellant Ohio Bureau of Motor Vehicles to adopt rules and regulations. "The purpose of administrative rulemaking is to facilitate the administrative agency's placing into effect the policy declared by the General Assembly in the statutes to be administered by the agency. In other words, administrative agency rules are an administrative means for the accomplishment of a legislative end." *Carroll* v. *Dept. of Admin. Services* (1983), 10 Ohio App. 3d 108, 110, 10 OBR 132, 133, 460 N.E. 2d 704, 706. Moreover, "* * * [r]ules issued by administrative agencies pursuant to statutory authority have the force and effect of law." *Parfitt* v. *Columbus Correctional Facility* (1980), 62 Ohio St. 2d 434, 436, 16 O.O. 3d 455, 456, 406 N.E. 2d 528, 530. See, also, *State, ex rel. Kidlow,* v. *Indus. Comm.* (1934), 128 Ohio St. 573, 580, 1 O.O. 235, 238, 192 N.E. 873, 876; *Hiram House* v. *Indus. Comm.* (1987), 42 Ohio App. 3d 29, 32, 536 N.E. 2d 36, 39.

R.C. 4501.02 is the statute which establishes the Ohio Bureau of Motor Vehicles, and provides in pertinent part: "There is hereby created in the department of highway safety a bureau of motor vehicles, which shall be administered by a registrar of motor vehicles. The registrar shall be

appointed by the director of highway safety and shall serve at his pleasure.

"The registrar shall administer the laws of the state relative to the registration of and certificates of title for motor vehicles * * *. *He may,* with the approval of the director of highway safety, *adopt such forms and rules as are necessary to carry out all the laws he is required to administer.* * * *" (Emphasis added.)

R.C. Chapter 4507 sets forth the driver's license law in Ohio. R.C. 4507.01(B) states in part: "In the administration of this chapter and Chapter 4506. of the Revised Code, the registrar of motor vehicles *has the same authority* as is conferred on the registrar by section 4501.02 of the Revised Code. * * *" (Emphasis added.)

From the foregoing, it is clear that appellant is authorized to promulgate the rule in question (Ohio Adm. Code 4501:1-1-16[B][1]) in order to enforce R.C. 4507.08. Furthermore, according to the Ohio case law set forth above, this rule is to be given the force and effect of law. See 2 Davis, Administrative Law Treatise (2 Ed. 1979) 36-37, Section 7:8. See, also, *Jeno Associates, Inc.* v. *Lindley* (1980), 64 Ohio St. 2d 365, 367, 18 O.O. 3d 518, 519, 415 N.E. 2d 292, 293, fn. 1, wherein it is stated that "* * * [a] legislative rule is a rule adopted by an agency pursuant to a grant of specific legislative authority. Generally, such a rule has the force and effect of law,

and is thus binding on a court * * *." (Citing *Davis, supra.*)

In determining that Ohio Adm. Code 4501:1-1-16(B)(1) is constitutionally infirm, the court of appeals relied exclusively on *Gatts* v. *State* (1984), 13 Ohio App. 3d 380, 13 OBR 463, 469 N.E. 2d 562. The court in *Gatts, supra,* found that "[t]he administrative agency has defined 'alcoholic' in terms of the frequency of convictions for driving under the influence of intoxicating liquor and thereby established a conclusive presumption of the status of the license holder." *Id.* at 381-382, 13 OBR at 465, 469 N.E. 2d at 563. The court went on to conclude that because Ohio Adm. Code 4501:1-1-16 establishes a conclusive presumption as to the status of a person as an alcoholic, due process had been violated. We disagree, and expressly disapprove the holding of *Gatts.*

## II

According to R.C. 4507.08, no person who is an alcoholic shall be issued or retain an operator's license.[1] In order to administer and enforce this statute, it was necessary for appellant to adopt a rule defining the word "alcoholic." Ohio Adm. Code 4501:1-1-16(B)(1). Recently, the General Assembly has enacted R.C. 3793.01(A), wherein the following definitions are found: "(1) 'Alcoholism' means the chronic and habitual use of alcoholic beverages by an individual to the ex-

---

[1] See Ohio Adm. Code 4501:1-1-18(C) for restoration of a license:

"Driving privileges will not be restored until the registrar of the bureau of motor vehicles receives information obtained in a form to be prescribed by the registrar of motor vehicles and signed by a physician licensed pursuant to Chapter 4731. of the Revised Code, stating that the person has successfully completed a treatment/rehabilitation program and has maintained a continuous six-month period of sobriety from alcohol and/or freedom from addiction of any controlled substances from the date of completion of the rehabilitation program."

tent that *he no longer can control his use of alcohol or endangers the health, safety, or welfare of himself or others.*

"(2) 'Alcoholic' means a person suffering from alcoholism." (Emphasis added.)

There is, however, no precise, singular, all encompassing definition of "alcoholism" which is appropriate in all situations or describes all persons who are alcoholic. An alcoholic is not susceptible to one definitive description. A large body of literature has been written pertaining to alcoholics and alcoholism, and there cannot be found one all encompassing definition which will apply to all individuals. E.M. Jellinek, in his landmark treatise on The Disease Concept of Alcoholism, discussed the almost impossible task of defining "alcoholism" and "alcoholic." He commenced his discussion by stating, "[w]e have termed as alcoholism any use of alcoholic beverages that causes *any damage* to the individual or society or both." (Emphasis deleted in part.) Jellinek, The Disease Concept of Alcoholism (College & Univ. Press 1960), at 35. Even Jellinek was quick to point out Benjamin N. Cardozo's famous quotation: "Peril lurks in definitions, so runs an ancient maxim of law." *Id*. at 33. In order to enforce R.C. 4507.08 it was necessary, however, for the Registrar to attempt to define "alcoholic." The Registrar adopted one definition which, as will subsequently be demonstrated, is appropriate to accomplish the legislative purpose of R.C. 4507.08.

"Professionals who work extensively with alcoholics widely subscribe to the 'disease concept' of alcoholism. The modern 'disease concept' of alcoholism was given its basic foundation in E.M. Jellinek's book *The Disease Concept of Alcoholism.* Since the publication of that book, researchers have worked to define alcoholism within rigorous parameters. These efforts have met with mixed success.

"Scientists have been unable to articulate a specific set of characteristics that describes all alcoholics. * * *" Note, Drunk Driving and the Alcoholic Offender: A New Approach to an Old Problem (1987), 12 Am. J. of Law & Med. 99, 103, hereinafter "Drunk Driving."[2]

It has been said that "[i]n delineating the disease concept of alcoholism, Jellinek (1960) was far more cautious and * * * [other authors] suggest that there is no single entity which can be defined as alcoholism. The point is that alcoholism cannot be reified but reflects a collection of * * * episodic behaviors that collectively make up as many alcoholics as there are alcohol abusers." Vaillant, The Natural History of Alcoholism (Harv. Univ. Press 1983) 3.[3]

What makes a person an alcoholic

---

[2] "Dr. Jellinek had extensive clinical experience in the treatment of alcoholics. His book [E. Jellinek, The Disease Concept of Alcoholism (1960)] tried to identify some common denominators characteristic of alcoholism. His clinical experience showed him that not all alcoholics followed the same course. He identified four types of alcoholics, which he called 'alpha,' 'beta,' 'gamma,' and 'delta.' 'Gamma' and 'delta' alcoholics had a physiological dependence on alcohol. Jellinek's typology is no longer used, but his major contribution to the field, the initiation of serious discussion of alcoholism as a disease, lives on." Drunk Driving, *supra,* at 103, fn. 21.

[3] Moreover, consider the following from Vaillant, The Natural History of Alcoholism, *supra,* at 3: "* * * [T]he World Health Organization in 1951 decreed that 'Alcoholism (or rather certain forms of it) is a disease process.'

"Since the WHO report, writers * * *

is his inability to control his drinking. "Alcoholism becomes a disease when loss of voluntary control over alcohol consumption becomes a necessary and sufficient cause for much of an individual's social, psychological, and physical morbidity." See *id.* at 44. A person who is not an alcoholic is less likely to drink and drive after having been convicted once for driving while intoxicated than an alcoholic who cannot control either the frequency or the amount he drinks.[4] Thus, we find Ohio Adm. Code 4501:1-1-16(B)(1) provides a reasonable definition of one type of alcoholic for the limited purpose of enforcing and administering R.C. 4507.08.[5]

---

have suggested that the term 'alcoholism' is too vague to have meaning. * * *

"* * * The American Medical Association, American Psychiatric Association, American Public Health Association, American Hospital Association, American Psychological Association, National Association of Social Workers, World Health Organization, and the American College of Physicians have now each and all officially pronounced alcoholism as a disease. The rest of us can do no less.' (1973, p. 8)."

"* * * Studies show that problem drinkers make up as much as two-thirds of the DWI offender class. Alcoholic drunk drivers cannot fully conform their drinking behavior to the dictates of the law so long as their alcoholism remains untreated. This Note argues that the law should consistently treat alcoholism as a disease. * * * [T]he most appropriate way for the legal system to deal with alcoholic DWI offenders is to suspend the offender's license until he can show that he has successfully completed an initial detoxification/rehabilitation program." Drunk Driving, *supra,* at 99.

[4] "Several studies have demonstrated the extensive interrelation between alcohol abuse and drunk driving. One study has shown that almost two-thirds of those charged with DWI, and half the drivers involved in accidents after drinking, are either alcoholic or alcohol abusive. Since close to 66 percent of the DWI population suffers from alcohol problems, in contrast to a 10 percent incidence in the general population, there appears to be a significant correlation between alcohol abuse and DWI. Researchers generally agree that alcoholics and alcohol abusers are more likely to be involved in traffic accidents than light drinkers or non-drinkers." (Footnotes omitted.) Drunk Driving, *supra,* at 116. The writer relied upon the following authorities for his conclusion: U.S. Dept. of Health and Human Services, Fifth Special Report to the U.S. Congress on Alcohol and Health (1983) 9; and Fell, Alcohol Involvement in Traffic Accidents: Recent Estimates from the National Center for Statistics and Analyses, NHTSA Technological Report No. DOT HS (1982) 806-269.

[5] We note that other jurisdictions have dealt with the menace of recidivist drunk drivers. Several states have enacted what is commonly referred to as habitual traffic offender or habitual traffic violator statutes. See Fla. Stat. Ann., Title 22, Sections 322.263 *et seq.;* Del. Code. Ann. (Rev. 1974), Title 21, Chapter 28; West's Ann. Ind. Code, Title 9, Article 12; Iowa Code Ann., Section 321.555 *et seq.;* West's Rev. Code Wash. Ann., Title 46, Chapter 46.65. Typically, these statutory provisions deal with the suspension/revocation of a person's driver's license, where that person has been convicted of certain enumerated offenses. These offenses usually include some type of vehicular manslaughter, using a motor vehicle in the commission of a felony, driving while intoxicated, and/or a variety of other traffic violations. In some instances, the statutes contain a broad, clear statement of legislative intent or policy. See West's Fla. Stat. Ann., Section 322.263; Del. Code Ann., Section 2801; and West's Rev. Code Wash Ann., Section 45.65.010. These types of neutral statutes would remove any perceived social stigma that may be attached to the term "alcoholic," while still addressing the problem of repeat drunk driving offenders.

## III

We have already established that the Registrar has the authority to promulgate rules which, if enacted pursuant to a specific grant of legislative authority, have the force and effect of law. Hence in defining "alcoholic" the Registrar was carrying out the policy enunciated by the General Assembly in enacting R.C. 4507.08. Appellee, however, contends that Ohio Adm. Code 4501:1-1-16(B)(1) violates due process in that it creates a conclusive presumption that any person convicted of three DWI offenses in a three-year time span is an "alcoholic" within the meaning of R.C. 4507.08. The question which we must address is whether appellee is denied due process of law by not being able to present evidence establishing that he is not an alcoholic. In other words, is it permissible to term every person with three convictions for DWI within three years an alcoholic?

This court has previously stated that "[d]ue process of law implies, in its most comprehensive sense, the right of the person affected thereby to be present before the tribunal which pronounces judgment upon a question of life, liberty or property, to be heard, by testimony or otherwise, and to have the right of controverting, by proof, every material fact which bears on the question of right in the matter involved. If any question of fact or liabili-ty be conclusively presumed against him, such is not due process of law." *Williams* v. *Dollison* (1980), 62 Ohio St. 2d 297, 299, 16 O.O. 3d 350, 351, 405 N.E. 2d 714, 716. However, this case involves an administrative proceeding, wherein procedural due process does not and cannot require strict application of the judicial model. *Dixon* v. *Love* (1977), 431 U.S. 105, 115. It is also clear that in Ohio, a license to operate a motor vehicle is a privilege, and not an absolute property right. See *State* v. *Newkirk* (1968), 21 Ohio App. 2d 160, 165, 50 O.O. 2d 253, 255, 255 N.E. 2d 851, 854; *Wilsch* v. *Bencar* (1966), 7 Ohio App. 2d 165, 167, 36 O.O. 2d 305, 307, 319 N.E. 2d 311, 313.[6]

We find several cases from the United States Supreme Court instructive as to the appropriate test this court should apply. In *Dixon* v. *Love, supra,* the court examined an Illinois statute and regulations that provided for summary suspension or revocation of a driver's license and an administrative hearing only after the suspension or revocation. The court held that this statutory scheme did not violate due process, and applied the test first enunciated in *Mathews* v. *Eldridge* (1976), 424 U.S. 319. While the *Eldridge* court was confronted with the continued entitlement to disability benefits, the due process analysis is appropriate to other ad-

---

[6] We find the reasoning used by the court in *Newkirk, supra,* persuasive. While commenting on the privilege aspect of operating a motor vehicle, the court stated:

"The state has the right under its sovereign power to control automobile traffic by reasonable regulations of the circumstances under which its citizens may be licensed to operate a motor vehicle and to adopt appropriate provisions to insure competence and care on the part of licensees, to protect others using the highways; and any appropriate means adopted does not deny to a person subject to its provisions any constitutional rights under the Constitution of the United States or the state of Ohio." *Id.* at 165, 50 O.O. 2d at 256, 255 N.E. 2d at 854. See, also, *Div. of Driver Licensing* v. *Bergmann* (Ky. 1987), 740 S.W. 2d 948 (driver's license is legitimately regulated privilege, not inherently fundamental right).

ministrative hearings as well. (See *Maumee* v. *Gabriel* [1988], 35 Ohio St. 3d 60, 62, 518 N.E. 2d 558, 561.) This test establishes three factors which must be weighed, and provides as follows: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or·substitute procedural requirement would entail." *Eldridge, supra,* at 335.

Two years later, the court once again utilized the *Eldridge* test, this time in *Mackey* v. *Montrym* (1979), 443 U.S. 1. The *Mackey* court encountered a Massachusetts statute that required a ninety-day suspension for any driver who refused a breath-analysis test upon arrest for operating a motor vehicle while under the influence of intoxicating liquor. Once again, the court was confronted with a due process challenge. Upon applying the *Eldridge* test, the court held that due process was not violated and upheld the statutory provisions under attack.

Appellee argues that the *Eldridge* test cannot be applied to this case because in both *Mackey* and *Love,* the defendant-driver was seeking a presuspension hearing. Appellee contends he does not seek a presuspension hearing, but rather that his post-suspension hearing violated due process because it did not allow him to introduce evidence as to whether he was an alcoholic. This contention is tantamount to raising an issue as to the amount of process due in a post-suspension hearing. The court in

*Mackey, supra,* stated the issue before it as follows: "* * * the only question presented by this appeal is *what process is due* to protect against an erroneous deprivation of * * * [a driver's license]." (Emphasis added.) *Id.* at 10. As noted above, the court went on to apply the *Eldridge* test. Therefore, we find that the analysis set forth in *Eldridge* is applicable to this case.

Our examination of the first factor in the *Eldridge* test involves the private interest that will be affected by the official action. We emphasize that an operator's license in the state of Ohio is a privilege, and is not a property right. While appellant must be afforded due process, we reiterate that since this is an administrative proceeding, the judicial model need not be strictly followed. See *Love, supra.* Moreover, the private interest affected by the action of appellant is twofold: (1) labeling appellee an alcoholic because he has three DWI convictions in three years, and (2) suspension of his driver's license. We have already determined that Ohio Adm. Code 4501:1-1-16 provides an appropriate definition of an "alcoholic." Thus the only issue remaining is whether appellee was in fact convicted three times of DWI in three years. Appellee is, by statute, allowed a post-suspension hearing within ten days if he so desires at which time this issue may be addressed.

The second factor to be considered is the risk of erroneous deprivation of the interest involved. In the present case, the risk of erroneous deprivation of appellee's driver's license is minimal. We are confronted with a driver whose license has been suspended by reason of three *convictions* for driving while intoxicated in a time span of three years.[7] While ac-

_____

[7] In *Mackey, supra,* the court upheld a suspension based on the affidavit and records of an arresting police officer. In so doing, the court stated as follows: "* * *

cumulating these three convictions, appellee was afforded the full panoply of constitutional rights available to him under the federal and Ohio Constitutions. Moreover, appellee does not, and has indeed never contended, that his three convictions were anything but lawful. Hence, the only perceivable risk of error in this case is labeling appellee an alcoholic when he may not be an "alcoholic." However, based upon the foregoing consideration of authorities on alcoholism, the risk is non-existent and therefore does not violate due process.[8]

The third factor enunciated in the *Eldridge* test requires that we consider the state's interest. Included in this prong is an evaluation of the function involved, and the fiscal and administrative burdens that additional procedural requirements would entail. The state's interest is obviously promoting highway safety. In *Mackey, supra,* the court concluded that "* * * the *compelling interest in highway safety* justifies the Commonwealth in making a summary suspension effective pending the outcome of the prompt post-suspension hearing available." (Emphasis added.) *Id.* at 19. We need not engage in a pointless and verbose recitation of statistics involving accidents and fatalities caused by the menace of drunk drivers. One need only watch the evening news or read the daily newspaper to witness the destruction of human lives caused by the actions of drunken drivers. The United States Supreme Court has eloquently expressed its view regarding such statistics: "The carnage caused by drunk drivers is well documented and needs no detailed recitation here." *South Dakota* v. *Neville* (1983), 459 U.S. 553, 558. "The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield." *Breithaupt* v. *Abram* (1957), 352 U.S. 432, 439. "* * *[T]he frightful carnage [that traffic irresponsibility] spews upon our highways," *Tate* v. *Short*

---

The officer whose report of refusal triggers a driver's suspension is a trained observer and investigator. He is, by reason of his training and experience, well suited for the role the statute accords him in the presuspension process. * * * Moreover, as this case illustrates, there will rarely be any genuine dispute as to the historical facts providing cause for a suspension." *Id.* at 14. The court went on to conclude that the risk of error "is not so substantial in itself as to require us to depart from the 'ordinary principle' that 'something less than an evidentiary hearing is sufficient prior to adverse administrative action.'" *Id.* at 17, quoting *Dixon* v. *Love, supra,* at 113.

[8] We find that case law from other jurisdictions provides support for this position. In *Pollack* v. *Dept. of Motor Vehicles* (1985), 38 Cal. 3d 367, 211 Cal. Rptr. 748, 696 P. 2d 141, the Supreme Court of California held that the opportunity to be heard in each criminal trial precedent to the convictions for drunk driving, the right to contest the validity of prior convictions, and a prompt hearing to contest the accuracy of the records upon which a suspension is based were sufficient to satisfy the demands of due process. Likewise, in *Paterson* v. *Dept. of Motor Vehicles* (1985), 171 Cal. App. 3d 1126, 217 Cal. Rptr. 881, the court stated as follows:

"The facts [three DWI convictions] which gave rise to the application of Vehicle Code section 13352 in plaintiff's case had already been judicially established by the highest standard of proof known to our law, *proof beyond a reasonable doubt,* or by his admission. Another due process hearing as to the existence of such facts would be idle. ' "The only precedent event required as the basis for action by the department is the receipt by it of 'a record' of conviction[s]." ' * * *" (Citations omitted.) *Id.* at 1129, 217 Cal. Rptr. at 882-883.

(1971), 401 U.S. 395, 401 (Blackmun, J., concurring), is exceeded only by the death toll of all our wars, *Perez* v. *Campbell* (1971), 402 U.S. 637, 657, 672 (Blackmun, J., concurring). We conclude that the state has a paramount interest in promoting public safety by removing drunk drivers from the highways.

Likewise, we must examine the administrative and fiscal burdens that would accompany any further procedural requirements. The court in *Mackey, supra,* noted as follows: "* * * the availability of a presuspension hearing would generate a sharp increase in the number of hearings sought and therefore impose a substantial fiscal and administrative burden on the Commonwealth." *Id.* at 18, citing *Dixon* v. *Love, supra,* at 114. The sole purpose of the post-suspension hearing at issue is to determine whether appellee was in fact convicted three times for DWI in the three immediately preceding years. The cost in time and money related to an expanded evidentiary hearing, as demanded by appellee, does not justify such a requirement. No purpose would be served by permitting evidence to be presented as to whether the individual is or is not an alcoholic each time the Registrar proceeds to suspend a license pursuant to R.C. 4507.08.

We therefore conclude that Ohio Adm. Code 4501:1-1-16(B)(1) reasonably defines the term "alcoholic" so as to carry out the legislative purpose of R.C. 4507.08. The rule does not violate the due course of law provision of the Ohio Constitution.

Therefore, the judgment of the court of appeals is hereby reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., SWEENEY, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.

HOLMES, J., concurs in judgment only.