[Cite as *State v. Herron*, 2014-Ohio-3166.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                    :        C.A. CASE NO.    25850

v.                                                :        T.C. NO.    12CR3171

CODEY S. HERRON                          :          (Criminal appeal from
                                                          Common Pleas Court)

    Defendant-Appellant               :

                                                  :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the ____18th____ day of ____July____, 2014.

. . . . . . . . . .

TIFFANY C. ALLEN, Atty. Reg. No. 0089369, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

DANIEL F. GETTY, Atty. Reg. No. 0074341, 46 E. Franklin Street, Centerville, Ohio 45459
    Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**  This matter is before the Court on the Notice of Appeal of Codey S.

Herron,

filed July 30, 2013. Herron appeals from the trial court's May 20, 2013 judgment entry of conviction, entered following pleas of no contest[1] to one count of carrying a concealed weapon (loaded, ready at hand), in violation of R.C. 2923.12(A)(2), a felony of the fourth degree, and one count of improper handling of a firearm in a motor vehicle (loaded, no license), in violation of R.C. 2923.16(B), also a felony of the fourth degree. One count of receiving stolen property (firearm), in violation of R.C. 2913.51(A), a felony of the fourth degree, was dismissed. Herron was sentenced to community control sanctions not to exceed five years. For the following reasons, we hereby affirm the judgment of the trial court.

{¶ 2} Herron was indicted on November 21, 2012, and on December 6, 2012, he pled not guilty. On December 20, 2012, Herron filed a Request for Intervention in lieu of Conviction, which the State opposed. On February 4, 2013, Herron filed a Motion to Suppress, and on February 6, 2013, he filed a Supplemental Motion to Suppress. A hearing was held on Herron's motion to suppress on February 22, 2013, and April 12, 2013.

{¶ 3} On February 22, 2013, Brad Zollers testified that he is employed as a deputy sheriff for Montgomery County. He stated that he is assigned to the Northland Village Apartment complex, "so I am specifically assigned to handle all the dispatches, be proactive and reactive to calls." He stated that the area is a "known high-crime area where weapons and narcotics regularly occur, crimes of violence being anywhere from assault to domestic violence all the way up to, like felonious (sic) and stabbings and shootings." When asked how many of those types of crimes he has observed in the area of the complex, Zollers

---

[1] We note that Herron's Judgment Entry of Conviction erroneously provides that he entered pleas of guilty.

stated, "* * * when you're talking about gun violence, you're talking anywhere from a simple CCW to an actual shooting. Several dozen estimate." Zollers testified that he was on routine patrol in the area on October 22, 2012, around 4:30 p.m., when he "observed a white Mercury vehicle traveling south on Embassy. It caught my attention. I noticed that the vehicle's windshield was cracked which made the vehicle unsafe." Zollers stated that it was light outside at the time, and that as "the vehicle was traveling south on Embassy, I was on Republic so I had a clear shot in front of the windshield. The crack was in the middle of the windshield running parallel which would be obstructing the driver's view."

{¶ 4} According to Zollers, "the crack is in itself a problem especially if they hit a bump or something strikes the window, due to that crack, that window is likely to crack and expand and make the vehicle unsafe * * * ." Zollers stated that the driver was preparing to turn left and head east on Republic. At this point, Zollers was stopped at the intersection on Republic, just 15 to 20 feet from the vehicle. Thus, Zollers' view of the vehicle was unobstructed. Upon observing the vehicle, Zollers stated that he "turned around on Republic," and began to follow the vehicle. Zollers testified that he "ran the vehicle's Ohio license plate through our LEEDS system and found out who the vehicle was registered to. And then in the area of Needmore and North Dixie Drive, I conducted a traffic stop on the vehicle for the violation of unsafe vehicle." Zollers stated that just prior to the stop, "[w]e exited [the] Northland property and were just inside the township of Harrison."

{¶ 5} According to Zollers, there were two people in the vehicle, and he testified that he "made contact with the driver. He provided me with his Ohio driver's license identifying himself as Aaron Robbins the registered owner of the vehicle. I spoke

with him about the reason for the traffic stop. He acknowledged the crack in the windshield saying he understood * * * ." Zollers testified that after he "got done speaking with Robbins, * * * I turned my attention and as I began to ask if he had any type of identification, Mr. Herron said I knew who he was. So I said, I may know who you are but could you identify yourself? He said [that] his name was Codey Herron." According to Zollers, "Mr. Robbins appeared to be a little overly nervous. I noticed his hand had been shaking a little bit when he handed me his Ohio driver's license. While speaking with him, though, [Herron] would always speak up when I would ask Robbins a question." Zollers "found it sort of odd that every time [I] would ask Robbins a question, [Herron] would chime in when I was specifically addressing Robbins. [Herron] seemed to be just as nervous as Robbins." According to Zollers, "while speaking with Robbins, I asked him if there was anything illegal in the vehicle and [Herron] chimed up and said, no, there's nothing in the car. I readdressed Robbins and I said, I'm specifically speaking to you. It's your vehicle. I said, would you have any problem granting me consent to search the inside of this vehicle? At the same time both of them said, yeah." The following exchange occurred:

> Q. Let me stop you for a second. Is that specifically how you asked
>
> for consent to search the vehicle?
>
> A. Yes, directly towards Mr. Robbins.
>
> Q. That was the specific language that you used?
>
> A. Yes. Specific after they both said there's nothing illegal in the
>
> vehicle. I readdressed I'm speaking with Mr. Robbins and then just as I said,
>
> I asked him if he gave consent.

Q. Sorry, I'm just going to go back one more time a little bit. When you said that they both responded, who else other than Mr. Robbins responded to your question?

A. Codey.

Q. Okay. What did Codey say?

A. Codey, well Codey initially said, no, there's nothing in the car. And then when I addressed Mr. Robbins about if he would grant me consent, him and Codey both said, yeah, go ahead.

* * *

Q. And just for clarification, what was the driver's answer to the question?

A. He consented. He said, yes, you can search the car.

{¶ 6} Zollers stated that at the time he did not display his weapon or tazer, that he did not raise his voice, and that he did not make any threats. Zollers stated that upon obtaining Robbins' consent to search the vehicle, he "advised him that I was going to return to my vehicle, conduct a couple things that I needed to do and then I would return. So after obtaining his ID, getting Codey's information, I returned to my vehicle. As I was walking back to my vehicle, another deputy came, responded to assist." Zollers stated that as he walked to his cruiser, he "observed over my right shoulder that [Herron] was looking over his right shoulder and tracking where I was going," while Robbins "was looking forward[,] he was not watching where I was going." Zollers described Herron's conduct in the course of the stop as "a little odd, not normal."

{¶ 7}     Zollers stated that when he returned to Robbins' vehicle he "first made contact with Robbins, confirmed he was granting consent to search the vehicle which he advised, yes, he was * * * ." Zollers stated that he asked Robbins to step out of the vehicle and then "conducted a protective pat down at his consent for any weapons." Zollers stated that he then had Robbins stand behind the cruiser with the other deputy while he "walked around and made contact with [Herron], same thing. I asked him to exit the vehicle. I conducted a protective patdown with his consent and then I asked him to stand with Robbins in front of the cruiser." Zollers stated that he then began a search of the vehicle on the passenger side, and he stated that in the course of his search he looked "under the seat which is a common area where things would be hidden and right under the front passenger seat, there's a semi-automatic handgun." Zollers stated that when he advised Robbins and Herron about the weapon, "they advised they knew nothing about it." Zollers stated that he placed both men under arrest and into separate cruisers. He stated that he issued a citation for the windshield violation, pursuant to R.C. 4513.02, a minor misdemeanor.

{¶ 8}     On cross-examination, Zollers acknowledged that he did not feel the crack on the windshield or measure it. He testified, however, that he observed that the crack was "through and through. * * * after I made the stop and I explained the reason for the stop and [Robbins] acknowledged he understood why, I mean speaking to him looking through you could clearly see there was a crack throughout the entire windshield, not just a surface crack. It was on the inside and out." Zollers stated that he did not sit in the driver's seat of Robbins' vehicle to determine if the crack would actually obstruct the view of the driver.

Zollers stated that an evidence technician responded to the scene and photographed the vehicle. He stated that he spent "less than three, five minutes" talking to Robbins and Herron before he returned to his vehicle to do a record check, and that he was in his cruiser for "[l]ess than a minute" before returning to Robbins' vehicle. Zollers stated that he spent a minute each patting down Robbins and Herron and that he "began searching the area where [Herron] was seated since that's where I was last standing and I found the gun within a minute." Zollers stated that both men were "arrested for CCW and RSP. Mr. Robbins was the only one that got a citation."

{¶ 9}      Pat Tannreuther testified that she has been employed at the Montgomery County Public Defender's Office for 17 years as an investigator. She stated that she photographed Robbins' vehicle "a couple days ago." According to Tannreuther, Robbins told him where she could find the car, and she "was looking for a white Mercury Grand Marquis and I found one. When I got out and looked at the car, I didn't notice the crack. I had to verify that it was the correct vehicle by the license plate." Tannreuther stated that when she "first walked up to the vehicle on the driver's side and I looked at the windshield, I didn't notice anything. As I verified the license plate and I went back to the windshield, I noticed what appeared to be a scratch." Tannreuther stated that the "scratch" began "on the passenger side maybe six inches from the far passenger side window and it went across to just right before the steering wheel area of the driver's side." She stated that it did not extend through the driver's side. According to Tannreuther, she "felt it actually on the first side of it over in front of the driver's window and the glass was smooth. When I checked the other side of the scratch or crack or whatever it is, it was smooth, too. And I ran my

hand all the way along it. I could feel no indentations, no sharp edges. It just appeared to be smooth glass." Tannreuther further stated that the "part on the passenger side appeared to be a little bit thicker but as it approached the driver's side, it, it all was pretty thin. But by the time you got over to the driver's side, * * * it just appeared to be a scratch."

{¶ 10} Tannreuther identified photographs that she took of the vehicle. Tannreuther testified that Exhibit C is a photo of the front of the vehicle, which was taken "maybe four feet away from the front of the vehicle." When asked if the "crack/scratch * * * [is] readily apparent in that picture," she stated, "not in this picture, no." Tannreuther identified Exhibit D which is also a picture of the front windshield taken at a closer range. When asked if she "can see something in that picture," she responded, " * * * just barely. It almost looks like it could be the line across the rear, the inside of the rear window but it could be a scratch." Tannreuther identified Exhibit H, which is another picture of the front of the vehicle taken from "[m]aybe 15 feet" away, and she stated that no crack or scratch is visible in the photo. Tannreuther identified Exhibits I and G, which are shots of the windshield taken from opposite angles, and she identified Exhibit F, a photo of the front of the windshield taken "by the front passenger side quarter panel toward the front of the vehicle," and she stated that "the scratch or crack appears to be over here on the passenger side. And it goes across the vehicle and it ends up * * * right close to where the steering wheel starts." Tannreuther identified Exhibit E, which is "a closer view right by the steering wheel. It's taken from the front. I zoomed in. You actually see what appears to be two lines, two scratches." Tannreuther stated that the crack is not visible from 15 to 20 feet away from the vehicle.

{¶ 11} On cross-examination, Tannreuther stated that she took the photos between 10:30 and 11:00 am, and that it was "a little overcast" at the time. She stated that the vehicle was locked and the windows were up, and that she did not feel the inside of the windshield. While responding to questions about Exhibit D, the court asked Tannreuther to "place an arrow at the point at which * * * you think the line ends so just simply use my blue pen and point to the arrow at the precise point where you believe the line ends in this photograph." In doing so, Tannreuther stated that the line "does appear to possibly go over towards the driver's side of the steering wheel." On re-direct examination, Tannreuther stated that the scratch did not obstruct her view into the vehicle, and she stated that the scratch "seemed to be so small, I wouldn't think that it would obstruct my view at all."

{¶ 12} On April 12, 2013, Zollers again testified. He identified State's Exhibit 3, a photograph of the windshield of the vehicle, taken from the front of the vehicle, depicting a scratch beginning to the left of the passenger seat and ending past the center of the steering wheel. Zollers stated that the photo was taken by an evidence technician. The court provided Zollers with a pen, and he circled the scratch in the photograph. According to Zollers, "* * * as far as the size of the crack, all the way across the window because at any time it could crack and, like, obstruct his view or it could fall in and hurt anybody inside the vehicle. That's what makes it unsafe." Zollers identified State's Exhibit 4, another photograph of the windshield, taken from the passenger side of the car, and he again circled the scratch, testifying, "I mean, due to the angle of  - - I'm no evidence technician. I haven't been trained in that, the picture taking, but the close up and the angle, it's not as visible." Finally, Zollers identified Exhibit 5, a photograph of the scratch taken from the

driver's side of the vehicle, and he circled the scratch with a pen.

{¶ 13} On cross-examination, Zollers stated that he observed the evidence technician photograph the car, and he estimated that the technician was five to ten feet away from the vehicle when he did so. When asked whether the scratch was "uniform in width all the way across the windshield," Zollers replied, "I can tell you it was a through and through crack." He further testified, "When I was talking to the driver and you could look through, you could see that the inside of the windshield was cracked as well as the outside." Finally, Zollers stated, "* * * Exhibit 3 clearly describes, you know, perfectly. It's exactly why I stopped the vehicle. And 4 and 5 are the same thing as 3. It just looks a little different, I guess, because of maybe the angle of the front windshield and who knows? The light conditions and where he was standing. * * * ."

{¶ 14} On redirect examination, Zollers stated that he has stopped vehicles for cracked windshields in the past, and that based upon his training and experience, the crack he observed in Herron's windshield "was the probable cause for the traffic stop." He stated that the windshield was "clearly unsafe."

{¶ 15} At the conclusion of the hearing, the court ordered post-hearing briefs. Herron filed his brief on April 29, 2013. Therein he asserted that "[b]ecause the officer did not reasonably believe the alleged crack in the windshield amounted to an unsafe condition, the officer did not have reasonable articulable suspicion to stop the vehicle," and "[e]ven if the court finds there was reasonable articulable suspicion to initiate the traffic stop, there was no reasonable suspicion to detain Mr. Herron for the purpose of searching the vehicle." Herron asked the court to find that he was unlawfully seized and unlawfully detained. On

May 10, 2013, the "State's Response to Defendant's Post Motion to Suppress Brief" was filed. The State asserted that it "proved its burden by clear and positive evidence that the defendant was not unreasonably detained. The deputy had reasonable and articulable suspicion for pulling the vehicle over. The deputy then obtained valid consent to search the vehicle during the process of issuing a citation."

{¶ 16} In its decision overruling Herron's motion to suppress, the trial court determined as follows:

> * * *
>
> This Court is fully persuaded by *State's Response to Defendant's Post Motion to Suppress Brief * * *.* For the reasons set forth in the *State's Response*, this Court finds:
>
> (1) Officer Zollers had reasonable articulable suspicion that the crack in the windshield of the vehicle in which the Defendant was a passenger rendered the vehicle to be in "such an unsafe condition as to endanger any person," in violation of R.C. 4513.02(A). Thus, Officer Zollers' stop of the vehicle was lawful; and
>
> (2) Officer Zollers was conducting a lawful consensual search of the vehicle. During this lawful search the Defendant was being lawfully detained.
>
> Therefore, the Defendant's *Motion to Suppress* is overruled.

Herron entered his pleas of no contest on June 13, 2013.

{¶ 17} Herron asserts one assignment of error, with subparts, as follows:

THE TRIAL COURT ERRED IN HOLDING THAT THE OFFICER WAS JUSTIFIED IN STOPPING THE VEHICLE AND DETAINING DEFENDANT TO SEARCH THE VEHICLE, IN VIOLATION OF HIS FOURTH AND FOURTEENTH AMENDMENT RIGHTS.

a. The Trial court Incorrectly Found that the Officer had a Reasonable and Articulable Suspicion that the minor crack in the windshield, of which Appellant was a passenger (sic), rendered the vehicle in such an unsafe condition as to endanger any person.

b. The Trial Court Incorrectly Found that the Defendant was being lawfully detained during the search and that the search was consensual.

{¶ 18} As this Court has previously noted:

"Regarding a motion to suppress, 'the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.' *State v. Hopfer* (1996), 112 Ohio App.3d 521, 548, 679 N.E.2d 321, quoting *State v. Venham* (1994), 96 Ohio App.3d 649, 653, 645 N.E.2d 831. The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac*, Montgomery App. No. 20662, 2005–Ohio–3733, 2005 WL 1707019, citing *State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498. Accepting those facts as true, the appellate court must then determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.*" *State v.*

*Demus*, 192 Ohio App.3d 181, 186, 2011–Ohio–124, appeal not allowed, 128 Ohio St.3d 1484, 2011–Ohio–2055.

*State v. Watson*, 2d Dist. Montgomery No. 24546, 2011-Ohio-5213, ¶ 5.

{¶ 19} R.C.4513.02(A) provides: "No person shall drive, move, or cause or knowingly permit to be driven or moved, on any highway any vehicle or combination of vehicles which is in such unsafe condition as to endanger any person." R.C. 4513.02(B) provides: "When directed by any state highway patrol trooper, the operator of any motor vehicle shall stop and submit such motor vehicle to an inspection under division (B)(1) or (2) of this section, as appropriate, and such tests as are necessary." Ohio Administrative Code 4501:2-1-11, provides: "Every motor vehicle shall be equipped with safety glass as required in Section 4513.26 of the Revised Code: Such glass shall be free of discoloration or diffusion, cracks, and unauthorized obstructions."

{¶ 20} In *State v. Latham,* 2d Dist. Montgomery No. 20302, 2004-Ohio-2314, ¶ 14, this Court addressed the issue of whether or not a cracked windshield gives rise to a reasonable suspicion of a violation of R.C. 4513.02(A) and noted as follows:

Ohio state courts have disagreed as to whether a crack in the windshield of a vehicle justifies a stop pursuant to R.C. 4513.02(A). *State v. Wilhelmy* (May 17, 2000), Hamilton App. No. C–990730 (holding that a police officer, who was not a state highway patrolman, did not have a reasonable suspicion to stop a vehicle whose windshield was cracked absent any evidence that the crack posed a threat to personal safety); *State v. Glinsey*

(Aug. 20, 1999) Williams App. No. WM–98026 (holding that a state highway patrolman did not have reasonable suspicion to stop a vehicle as unsafe when it had a crack in the windshield that extended four inches below the shaded portion of the windshield); *State v. Repp*, Knox App. No. 01–CA–11, 2001–Ohio–7034 (finding that a one to two foot long crack across the middle of the driver's side windshield of a vehicle was sufficient to create a reasonable suspicion to stop a vehicle as unsafe pursuant to R.C. 4513.02(A) in a local police officer); *State v. Heiney*, Portage App. No.2000–P–0081, 2001–Ohio–4287 (finding that a one foot long spider crack in the middle of a vehicle's windshield was "substantial" and gave a state highway patrolman reasonable suspicion that the crack rendered the vehicle unsafe and a violation of R.C. 4513.02); *State v. Goins* (May 24, 1996), Ross App. No. 95CA2106 (finding that a state highway patrolman had reasonable suspicion to stop a vehicle with a large linear crack in the front windshield for an equipment violation pursuant to R.C. 4513.02(A) and (B)); *State v. Imboden* (Nov. 16, 1993), Ross App. No. 92CA1901 (stating that a state highway patrolman did not have reasonable suspicion to stop a vehicle whose windshield was cracked on the passenger side of the vehicle, did not impair the driver's vision, and no evidence was presented that the cracked windshield affected the safeness of the vehicle). We note that in these opinions a crack in the windshield is generally found to amount to a reasonable suspicion of a violation of R.C. 4315.02(A) only when the crack is "substantial" or impairs

the driver's vision. Id. Some courts have stated that the combination of R.C. 4513.02(A) and O.A.C. 4501:2–1–11 make it a violation to operate a vehicle with any cracks in the windshield because administrative agencies' rules have the full force and effect of law when issued pursuant to statutory authority. *Repp*, supra citing *Doyle v. Ohio Bureau of Motor Vehicles* (1990), 51 Ohio St.3d 46, 554 N.E.2d 97; *Goins*, supra. Although the *Repp* court stated that a crack in a windshield violates R.C. 4513.02(A), the court continued on to state that the size and placement of the crack is what created the reasonable suspicion that R.C. 4513.02(A) was being violated. *Repp*, supra.

**{¶ 21}** The facts in *Latham* were as follows:

* * * the officers testified that the crack in Latham's windshield had been "not a very bad crack" but was "noticeable." The only evidence that the officers had a reasonable suspicion that the vehicle violated R.C. 4513.02 as an unsafe vehicle was Officer Simpson's statement under cross examination that he believed "it was an unsafe vehicle." (Tr. 19). The owner of the truck, Mrs. Latham, testified at the motion to suppress hearing about the truck and the crack in its windshield. Mrs. Latham testified that she had purchased the truck approximately three years prior and at the time the truck had had a crack in the windshield. (*Id*. at 46, 554 N.E.2d 97). Mrs. Latham entered into evidence pictures of the truck with a small, horizontal crack just above the windshield wiper between the driver's side of the vehicle and the middle of the vehicle. (*Id*. at 48, 554 N.E.2d 97). Mrs. Latham further testified that

when she had driven the vehicle the crack did not obstruct her vision at all.

(*Id*. at 49, 554 N.E.2d 97).

*Id*., ¶ 15.

{¶ 22} This Court noted that the matter was distinct from *Goins*, since the officers who stopped Latham were Dayton police officers, and not state highway patrolmen who are authorized to conduct stops for inspection purposes pursuant to R.C. 4513.02(B), and that "thus the issue is whether they had a reasonable suspicion that Latham was violating R.C. 4513.02(A) by operating an unsafe vehicle." *Id*., ¶ 16.

{¶ 23} This Court concluded as follows:

* * * [A]s the simple appearance of a crack in a windshield does not give rise to a reasonable suspicion of a violation of R.C. 4513.02(A), we must determine whether the particular facts surrounding the crack in the windshield in this case gave rise to a reasonable suspicion that Latham's truck was in an unsafe condition such that its operation would endanger persons. The trial court characterized the crack in Latham's truck as a "relatively short, horizontal, low crack on this truck windshield." Having reviewed the hearing testimony and the photographs of the truck's windshield entered into evidence, we agree with the trial court. The small crack in the windshield is low and would not appear to obstruct the vision of the driver of the truck. Considering the minor nature of the crack in the windshield, we cannot find that the officers had a reasonable suspicion that the small windshield crack had rendered the operation of the truck unsafe and in violation of R.C.

4513.02(A).

*Id.*, ¶ 19.

**{¶ 24}** In contrast, in *Repp*, 2001 WL 1674100, upon which the State relied in its post-hearing brief, the Fifth District affirmed the trial court's denial of Repp's motion to suppress after Repp was stopped when a police officer noticed "a large crack across the middle of the driver's side windshield." *Id.*, *1. The officer testified that he stopped Repp's vehicle "because the cracked windshield was unsafe," and the Fifth District noted that photographs in the record showed "a substantial crack on the driver's side of the front windshield. Said crack appears to be between one and two feet long and extends into the driver's viewing area. The size and placement of this crack was sufficient to create a reasonable suspicion that R.C. § 4513.02 was being violated." *Id.*, * 2.

**{¶ 25}** Having reviewed the record, including the photographs submitted by the parties, we conclude that the particular facts surrounding the crack in Robbins' windshield gave rise to a reasonable suspicion that Robbins' vehicle was in an unsafe condition, such that its operation would endanger persons in violation of R.C. 4513.02. Zollers testified that he observed the crack from "a clear shot in front of the windshield," at a distance of 15 to 20 feet, and that it was "in the middle of the windshield running parallel which would be obstructing the driver's view." He stated that if something struck the windshield, "due to that crack, that window is likely to crack and expand and make the vehicle unsafe." Zollers viewed the crack from the inside of the vehicle as well as from the outside, and he stated that the crack was "through and through the windshield" and not a minor surface crack. Zollers stated that Robbins acknowledged the crack as the basis for the stop. In each of the State's

Exhibits, Zollers drew a circle around the crack, and the photos clearly depict it in the middle of the windshield running from the passenger's side of the vehicle into what would be the driver's field of vision on the driver's side. The crack appears to exceed the distance of two feet in length. While Tannreuther characterized the damage to the windshield as minor, all of the head-on photos she took of the windshield reflect a significant crack across the middle of the windshield. Tannreuther did not view the crack from the inside of the vehicle. Since the nature of the crack herein is not small or minor, as in *Latham*, but rather is a substantial crack extending into the driver's viewing area, as in *Repp*, the trial court correctly determined that Zollers' stop of Robbins' vehicle was based upon a reasonable, articulable suspicion that the vehicle was in an unsafe condition.

**{¶ 26}** Regarding the search of the vehicle and Herron's detention, we agree with the trial court that the search was consensual whether or not Herron was lawfully detained. In its post-hearing brief, the State directed the court's attention to *State v. Watts*, 2d Dist. Montgomery No. 21982, 2007-Ohio-2411, in which this Court concluded that Watts' consent to search his vehicle was given freely and voluntarily in the course of a lawful stop for a window tint violation. At the time of the stop, Watts "was very nervous, more so than most people who are stopped for traffic violations," and the officer's request to search the vehicle "was based on [Watts'] extraordinary nervousness." *Id*., ¶ 3-4. This Court noted as follows:

A police officer's request for consent to search a vehicle stopped for a traffic violation is valid if it is made, and voluntary consent is obtained, during the period of time reasonably necessary to process the traffic citation;

in other words, while the driver is lawfully detained for the traffic violation. *State v. Loffer*, Montgomery App. No. 19594, 2003-Ohio-4980; *State v. Swope* (Nov. 9, 1994), Miami App. No. 93CA46. On the other hand, once a traffic citation is issued and the purpose of the original stop is completed, the lawful basis for the detention ceases. If police thereafter seek consent to search the vehicle absent some reasonable, articulable suspicion of criminal activity other than the traffic violation, the continued detention is unlawful. *State v. Retherford* (1994), 93 Ohio App.3d 586; *State v. Robinette*, 80 Ohio St.3d 234, 1997-Ohio-343. Any consent to search obtained during an unlawful detention is tainted and may be invalid. *Retherford*. For such consent to be voluntary, the totality of the circumstances must demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could, in fact, leave. *Robinette*.

*Id*., ¶ 12.

{¶ 27} Zollers testified that he approached the vehicle and obtained Robbins' driver's license and advised him of the purpose of the stop (which Robbins' acknowledged). As in *Watts*, Robbins was "overly nervous," and Herron "seemed to be just as nervous as Robbins" in the course of the stop. Zollers stated that Herron "would always speak up when [Zollers] would ask Robbins a question." When Zollers asked Robbins if there was anything illegal in the car, Herron "chimed up and said no, there's nothing in the car." Zollers readdressed Robbins specifically, stating, "* * * I'm speaking to you. It's your vehicle. * * * would you have any problem granting me consent to search the inside of this

vehicle?" Zollers testified that Robbins and Herron "both said, yeah, go ahead," in response to his question. Zollers further testified that he did not raise his voice, display a weapon, or make any threats to Robbins. Zollers stated that he spent "less than three, five minutes" initially talking to Robbins and Herron and "less than a minute" performing the record check in his cruiser. Upon his return to Robbins' vehicle, Zollers again confirmed Robbins' consent to search the car, and in the course of the search he found the weapon. Since Robbins' consent was obtained in the course of a lawful stop based upon the cracked windshield, Herron's Fourth Amendment rights were not violated. Herron's assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and HALL, J., concur.

Copies mailed to:

Tiffany C. Allen
Daniel F. Getty
Hon. Dennis J. Langer