[Cite as *Miller v. Ohio Dept. of Edn.*, 2017-Ohio-7197.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| ROBERT L. MILLER, JR. | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 27359 |
| | : | |
| v. | : | Trial Court Case No. 2016-CV-1738 |
| | : | |
| OHIO DEPARTMENT OF | : | (Civil Appeal from |
| EDUCATION | : | Common Pleas Court) |
| | : | |
| *Defendant-Appellee* | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of August, 2017.

. . . . . . . . . . .

DAVID M. DUWEL, Atty. Reg. No. 0029583, 130 West Second Street, Suite 2101, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellant

ADAM P. BESSLER, Atty. Reg. No. 0088764, 30 East Broad Street, 16th Floor, Columbus, Ohio 43215
      Attorney for Defendant-Appellee

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Plaintiff-Appellant, Robert Miller, Jr., appeals from a trial court order affirming an administrative decision of the Ohio Department of Education ("ODE") to permanently deny Miller's application and eligibility for a pupil activity permit. In support of his appeal, Miller contends that the trial court erred when it failed to adopt the decision of the ODE hearing officer. Miller also contends that he should have been given due process, because he sought a permit to engage in activity at a public institution.

{¶ 2} We conclude that the trial court did not abuse its discretion when it affirmed ODE's decision to deny Miller's application for a three-year pupil activity permit. Miller was also not denied due process during the administrative proceedings; to the contrary, he received all process required by applicable statutes and regulations. Accordingly, the judgment of the trial court will be affirmed.

I.   Facts and Course of Proceedings

{¶ 3} In September 2013, Robert Miller applied to ODE for a three-year pupil activity permit. The purpose of the permit was so that Miller could be certified to assist his wife, Sonya, who was the head coach for the women's basketball program at Wayne High School. Miller sought to volunteer for an unpaid position only; previously, he had unofficially assisted his wife on an unpaid basis.

{¶ 4} On the application, Miller answered "no" to questions asking whether he had ever been convicted of, found guilty of, pled guilty to, or pled no contest to a felony or to misdemeanors other than traffic offenses. After receiving Miller's application, ODE conducted a background check. In April 2014, the United States Air Force Office of

Special Investigations sent ODE a summary of information pertaining to criminal case files for Miller.[1]  Subsequently, in March 2015, ODE received further documentation from the Department of the Air Force regarding a court-martial proceeding involving Miller.[2]

{¶ 5} In April 2015, ODE sent Miller a notice of opportunity for hearing, indicating that ODE intended to decide if Miller's application for a three-year pupil activity permit should be denied or permanently denied based on one or more of five listed reasons. These reasons pertained to Miller's convictions in a general court-martial conducted at Wright Patterson Air Force Base ("WPAFB") on March 18, 1999,[3] on the following charges:  (1) a charge including two specifications of attempted larceny; (2) a charge including conspiracy to commit larceny and various allegations pertaining to falsification

---

[1] This information is contained in ODE Ex. 9, and was sealed by the trial court. In addition, the ODE hearing officer had previously sealed the parts of the hearing transcript that referred to ODE Ex. 9.  This was based on a warning about confidentiality that the Air Force had placed on the documents in the exhibit.  *See* October 6, 2015 Hearing Transcript, p. 112.  As a result, while we have reviewed Ex. 9 in its entirety, we will not discuss the content of the exhibit.

[2] This information is contained in ODE Ex. 10, which was also sealed by the trial court. In contrast to Ex. 9, the parts of the hearing transcript that discussed Ex. 10 were not sealed by the ODE hearing officer.  *See, e.g.*, October 6, 2015 Hearing Transcript, p. 139.  Notably, ODE's counsel stated at the hearing that Miller's court martial records (Ex. 10) were public records.  *Id.* at p. 190.  In view of this fact, Ex. 10 and references to Ex. 10 did not need to be sealed either in the hearing or by the trial court.  We, therefore, will discuss the content of Ex. 10 when necessary.

[3] The date on ODE's hearing notice is actually incorrect.  According to the documents provided by the Air Force, Miller was charged with five charges, and 32 specifications pertaining to those charges, on May 5, 1998, and was found guilty of all charges and specifications on July 15, 1998.  Miller was originally sentenced to 12 years imprisonment, a dishonorable discharge, reduction in grade to E-1, and forfeiture of all pay and allowances.  Subsequently, on March 18, 1999 (the date on the ODE notice), Miller was granted clemency, which reduced his sentence to nine years and six months imprisonment.  All other parts of his sentence remained unchanged.  In late July 2001, an Air Force colonel sent a notice from Washington D.C. headquarters, indicating that Miller's convictions had been affirmed.

under 18 U.S.C. 1001; (3) a charge including failure to obey a lawful general order or regulation; (4) a charge including seventeen specifications of larceny; and (5) a charge including one specification of violation of 18 U.S.C. 1001, and one specification of obstruction of justice. The alleged crimes covered events that occurred at Castle Air Force Base in California between October 28, 1994 and May 1, 1995, and at the Air Force Dayton Operating Location, Defense Financing and Accounting Service ("DFAS"), in Kettering, Ohio, between December 26, 1995 and June 25, 1997.

{¶ 6} Miller requested an ODE hearing, which was held on October 6, 2015. At that time, an ODE hearing officer heard testimony from the following individuals: Miller; Miller's wife, Sonya; Colonel Frank Titus, an expert retained by ODE; and Charley Yaniko, a staff attorney employed by the ODE Office of Professional Conduct. On December 14, 2015, the hearing officer filed a decision recommending that the Ohio Board of Education ("Board") approve Miller's pending application for a three-year pupil activity permit, subject to Miller providing the Board with written confirmation of his efforts at rehabilitation in accordance with Ohio Adm. Code 3301-20-01(E)(3)(d).

{¶ 7} On January 6, 2016, ODE objected to the hearing officer's decision. Subsequently, at the February 2016 Board meeting, the Director of the ODE Office of Professional Conduct presented the Board with a resolution to accept the report and recommendation of the hearing officer to issue a three-year pupil activity permit to Miller. After the recommendation to approve was seconded, a Board member moved to amend the resolution by substituting an alternative resolution permanently denying Miller's application and eligibility for a pupil activity permit. The Board agreed, with four dissenting votes, to allow the amendment, and then adopted the resolution. Two Board

members dissented from the adoption of the resolution. Miller was then notified of the Board's decision.

{¶ 8} In April 2016, Miller filed a notice of appeal with the Board and with the trial court. After both sides filed briefs, the trial court issued a decision in October 2016, concluding that the Board's decision was supported by reliable, probative, and substantial evidence. The court, therefore, affirmed the Board's final determination to permanently deny Miller's application and to permanently deny Miller's eligibility to apply for any license with ODE. Miller now appeals from the trial court's judgment.

II. Did the Trial Court Abuse Its Discretion in Affirming the ODE Decision?

{¶ 9} Miller's First Assignment of Error states that:

The Trial Court Committed Reversible Error When It Failed to Adopt the Decision of Hearing Officer Finnegan in Accordance with [the] Ohio Revised Code.

{¶ 10} Under this assignment of error, Miller contends that the Board improperly cited the hearing officer's "misstatements of fact" as a basis for its decision, when the alleged misstatements were not substantial and could not serve as a basis for reversing the hearing officer. Miller further contends that the Board failed to articulate sound reasons for overturning the hearing officer's decision, and that reversal is an abuse of discretion where the Board's findings are not supported by the record.

{¶ 11} This case involves an administrative appeal under R.C. 119.12. In such appeals, a trial court "may affirm the order of the agency complained of in the appeal if it finds, upon consideration of the entire record and any additional evidence the court has

admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 119.12(M). The Supreme Court of Ohio has defined this type of evidence as follows: " '(1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.' " *Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, ¶ 39, quoting *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571, 589 N.E.2d 1303 (1992).

{¶ 12} Appellate court review "is more limited than that of a trial court reviewing the same order. It is incumbent on the trial court to examine the evidence. Such is not the charge of the appellate court. The appellate court is to determine only if the trial court has abused its discretion." *Rossford Exempted Village School Dist. Bd. of Edn. v. State Bd. of Edn.*, 63 Ohio St.3d 705, 707, 590 N.E.2d 1240 (1992).

{¶ 13} " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). However, most abuses of discretion "will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.*

{¶ 14} The notice of opportunity of hearing sent to Miller in April 2015 alleged that Miller's conduct concerning the listed charges violated R.C. 3319.31(B)(1), (B)(2)(a),

(B)(2)(c), and (F).   This statute states, in pertinent part, that:

(B) For any of the following reasons, the state board of education, in accordance with Chapter 119. and section 3319.311 of the Revised Code, may refuse to issue a license to an applicant; may limit a license it issues to an applicant; may suspend, revoke, or limit a license that has been issued to any person; or may revoke a license that has been issued to any person and has expired:

(1) Engaging in an immoral act, incompetence, negligence, or conduct that is unbecoming to the applicant's or person's position;

(2) A plea of guilty to, a finding of guilt by a jury or court of, or a conviction of any of the following:

(a) A felony other than a felony listed in division (C) of this section;

* * *

(c) A theft offense, as defined in section 2913.01 of the Revised Code, other than a theft offense listed in division (C) of this section;

* * *

(F) The state board may take action under division (B) of this section, and the state board or the superintendent shall take the action required under division (C) of this section, on the basis of substantially comparable conduct occurring in a jurisdiction outside this state or occurring before a person applies for or receives any license.

{¶ 15} The ODE hearing officer concluded that Miller's court-martial convictions constituted conduct that was unbecoming to an applicant, and were also substantially

similar to felony convictions under Ohio law. However, the hearing officer also held that the convictions were not absolute bar offenses and did not involve students or minors under Ohio Adm. Code 3301-20-01(E)(1) and (2). In addition, the ODE officer concluded that Miller had met the conditions for demonstrating rehabilitation and that reasonable persons would not find that Miller's licensure would jeopardize the health, safety, and welfare of the school district.

{¶ 16} The Board disagreed. First, the Board rejected certain matters in the hearing officer's report, including: (1) the Recommendation section of the Summary Fact Sheet; (2) Findings of Fact 17, 18, 19, 20, and 21; (3) a portion of Conclusion of Law 24 regarding the length of time Miller had been employed; (4) Conclusions of Law 26, 30, and 32; (5) part of Conclusion of Law 32, insofar as it was based on time where Miller was being investigated and/or confined for criminal activity as mitigation; (6) the part of the second paragraph in Conclusion of Law 32, which concerned the length of time that Miller had been employed; and (7) the Recommendation section of the Report.

{¶ 17} The Board then noted that it could decide that "a penalty outside the disciplinary guidelines listed in the *Licensure Code of Professional Conduct* for Ohio Educators is more appropriate in an individual case based on the aggravating and mitigating factors of the Ohio Administrative Code 3301-73-21 and any other factors the State Board considers relevant." Doc. #11, Admin. Appeal Ex. X, p.26. In considering the aggravating factors, the Board focused on the following matters: Miller's conviction of 17 specifications of larceny totaling more than $436,000; Miller's conviction of two specifications of attempted larceny involving more than $501,000; the fact that these convictions involved public funds; the fact that the criminal conduct spanned two Air Force

bases and three years; the fact that Miller's convictions involved fraud and dishonesty; Miller's involvement of subordinate officers; Miller's failure to disclose his convictions on his application for a pupil activity permit; and Miller's sentence of nine-and-a-half years in military detention.

{¶ 18} The Board concluded that the hearing officer failed to give these facts and aggravating factors proper weight, and stated that it was also not persuaded by mitigating factors, including the lapse of time since Miller's criminal activity. As a result, the Board decided that issuing an application would demean the seriousness of Miller's conduct and would negatively impact the school community's health, safety, and welfare. The Board, therefore, permanently denied Miller's application and his eligibility to apply for any license with the Board.

{¶ 19} In affirming the Board's decision, the trial court noted that the Board had thoroughly reviewed the record and was entitled to disbelieve Miller's version of his convictions. The court further observed that the Board relied on probative evidence, including certified records of the convictions and Miller's admission that he had been convicted of the crimes.

{¶ 20} Before discussing the issues, we must correct one point – the trial court's statement that R.C. Chapter 2506 applies to this type of appeal. The court commented that appeals from decisions of boards of education are governed by R.C. Chapter 2506, and then cited authority pertinent to that type of appeal. It is true that R.C. Chapter 2506 applies to boards of education, but R.C. 2506.01(A) notes that it applies to boards "of any political subdivision of the state * * *."

{¶ 21} The Ohio Department of Education is an agency of the state, and the Ohio

State Board of Education is not a board of a political subdivision; the Board is part of a state agency, and its adjudications are subject to the appeal procedures and standards contained in the Ohio Administrative Procedure Act, R.C. Chapter 119. *See, e.g., State ex rel. Bd. of Ed. of Bratenahl Local School Dist. v. State Bd. of Ed.*, 53 Ohio St.2d 173, 176, 373 N.E.2d 1238 (1978) (citing R.C. 3301.13, which makes the functions of the State Board of Education subject to R.C. Chapter 119). In *Bratenahl*, the court also commented that the language in R.C. 2506.01 is "the counterpart to the judicial review provisions of R.C. Chapter 119 for administrative units of the various political subdivisions in this state * * *." *Id.* at 177. Consequently, even though the two statutory schemes are similar, R.C. Chapter 119, rather than R.C. Chapter 2506, applies to the Board's adjudications.

{¶ 22} In *Bartchy*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, the court also noted that R.C. 119.12 provides the standard of review for appeals brought under R.C. Chapter 119. *Id.* at ¶ 35-36. Thus, in reviewing agency decisions under Chapter 119, common pleas courts must "conduct two inquiries: a hybrid factual/legal inquiry and a purely legal inquiry. As to the first inquiry, 'the common pleas court must give deference to the agency's resolution of evidentiary conflicts, but "the findings of the agency are by no means conclusive." * * * "Where the court, in its appraisal of the evidence, determines that there exist legally significant reasons for discrediting certain evidence relied upon by the administrative body, and necessary to its determination, the court may reverse, vacate, or modify the administrative order." ' " *Id.* at ¶ 37, quoting *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 470-471, 613 N.E.2d 591 (1993). (Other citation omitted.) The Supreme Court of Ohio has interpreted " 'this

precedent to mean that an agency's findings of fact are presumed to be correct and must be deferred to by a reviewing court unless that court determines that the agency's findings are internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable.' " *Id.*, quoting *Ohio Historical Soc.* at 471.

{¶ 23} In view of the above discussion, the trial court erred in citing R.C. Chapter 2506 as authority. However, this error was harmless, because the court did apply the correct standard (which is consistent in both statutory schemes) of determining whether the agency's decision was supported by " ' "reliable, probative, and substantial evidence." ' " (Citations omitted.) *Bartchy* at ¶ 39; *Bratenahl*, 53 Ohio St.2d at 177, 373 N.E.2d 1238.

{¶ 24} Turning now to the substantive issues, Miller argues, in addition to the matters already mentioned, that the Board failed to understand what occurred concerning his criminal convictions. Miller also contends that the record lacks any objective evidence that he stole any money from the government. In addition, Miller challenges ODE's argument that he spent five years in a military prison; according to Miller, he only spent three days in prison.

A. Felony Convictions

{¶ 25} There was no real dispute during the administrative proceedings about whether Miller's convictions, which occurred as a result of a military court-martial, stemmed from conduct that was "substantially comparable" to conduct required for felony convictions for theft offenses under Ohio law. As an example, Miller was charged with

17 specifications of larceny, in violation of Article 121 of the Uniform Code of Military Justice ("UCMJ"), which can be found at 10 U.S.C. 921. The larceny specifications involved various amounts ranging from $2,343 to 280,229.51.[4]

{¶ 26} Article 121 of the UCMJ states that:

(a) Any person subject to this chapter who wrongfully takes, obtains, or withholds, by any means, from the possession of the owner or of any other person any money, personal property, or article of value of any kind –

(1) with intent permanently to deprive or defraud another person of the use and benefit of property or to appropriate it to his own use or the use of any person other than the owner, steals that property and is guilty of larceny * * *.

{¶ 27} Similarly, R.C. 2913.02, states, with respect to "theft," that:

(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:

(1) Without the consent of the owner or person authorized to give consent;

(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;

(3) By deception;

(4) By threat;

(5) By intimidation.

---

[4] The total amount at issue in the 17 specifications exceeded $436,000.

(B)(1) Whoever violates this section is guilty of theft.

**{¶ 28}** Ohio courts have indicated that "theft" and "larceny" have been used synonymously, although theft " 'is in reality a broader term, applying to all cases of depriving another of his property whether by removing or withholding it, and includes larceny, robbery, cheating, embezzlement, breach of trust, etc.' " (Citations omitted.) *State v. Frankel*, 10th Dist. Franklin No. 77AP-404, 1977 WL 200643, *3 (Dec. 13, 1977). *Accord Hoyne v. Buckeye Union Cas. Co.*, 46 Ohio Law Abs. 48, 52, 69 N.E.2d 153 (2d Dist.1943) (equating theft with larceny, while noting that some cases find theft a "broader term.")

**{¶ 29}** Under Ohio law, fifth-degree felony theft occurs when the value of the property is $1,000 to $7,500. R.C. 2913.02(B)(2). As the amounts increase, the degree also increases, from fourth to first-degree theft, which is the highest degree. *Id.* Thus, based on the amounts listed in the 17 specifications, Miller's offenses would have been felonies of the fifth, third, and second-degree under Ohio law. Miller admitted at the ODE hearing that he had pled guilty to the charges that formed the basis of the court-martial and his military sentence, but maintained that he was not guilty of the crimes. Consistent with the testimony and applicable law, the ODE hearing officer and the Board concluded that Miller's conduct met the requirements under R.C. 3319.31(B)(2)(a) and (c), for refusal to issue a license or to limit any license that would be issued.

### B. Conduct Unbecoming an Applicant for the Position

**{¶ 30}** The ODE hearing officer and the Board also concluded that Miller's court-martial convictions constituted grounds for refusing or restricting a license under R.C.

3319.31(B)(1) as "conduct unbecoming" an applicant's position. Again, this was consistent with the testimony and with Ohio Adm. Code 3301-73-21(A), which sets forth factors that should be considered in deciding if an applicant has engaged in conduct unbecoming an applicant under R.C. 3319.31(B)(1). Among other things, these factors include: "[m]aking, or causing to make, any false or misleading statement, or concealing a material fact in a matter pertaining to facts concerning qualifications for professional practice and other educational matters, or providing false, inaccurate, or incomplete information about criminal history or prior disciplinary actions by the state board or another professional licensing board or entity;" and "[a] plea of guilty to, or finding of guilt, of a conviction * * * to any offense in violation of federal, state, or local laws and/or statutes regarding criminal activity." Ohio Adm. Code 3301-73-21(A)(4) and (6).

{¶ 31} There is no question that these factors apply. Miller admitted during the hearing that he had pled guilty to numerous crimes, and that he failed to disclose information about his criminal history on his application.

{¶ 32} Where the Board finds that a person has engaged in unbecoming conduct, Ohio Adm. Code 3301-73-21(B) lists 14 factors that the Board should consider in deciding its final action. These factors are as follows:

(1) The nature and seriousness of the crime or misconduct;

(2) The extent of the person's past criminal activity or misconduct;

(3) The age of the person when the crime or misconduct was committed;

(4) The amount of time that has elapsed since the person's last criminal activity or misconduct;

(5) The conduct and work activity of the person before and after the criminal activity or misconduct;

(6) Whether the educator has completed the terms of his/her probation or deferred adjudication;

(7) Evidence of rehabilitation and evidence of whether the educator is amenable to rehabilitation as defined by paragraph (E) of rule 3301-20-01 of the Administrative Code;

(8) Whether the applicant is eligible for licensure pursuant to rule 3301-20-01 of the Administrative Code;

(9) Whether the person fully disclosed the crime or misconduct to the state board or the employing school district;

(10) Whether licensure will negatively impact the health, safety, or welfare of the school community and/or statewide education community;

(11) Whether the educator has previously been disciplined by the state board of education or any other licensing entity, including, but not limited to, out-of-state licensing entities;

(12) Whether the school district or educational entity imposed any penalties, sanctions, or other conditions addressing the educator's professional conduct;

(13) Whether the educator has been employed in any capacity within a school district or educational entity after having a license, certificate, or permit revoked; and

(14) Any other relevant factor.

{¶ 33} The ODE hearing officer found aggravating factors pertaining to the nature, seriousness, and extent of Miller's convictions and criminal activity, and the fact that he failed to disclose his convictions on his application. These findings pertained to Ohio Adm. Code 3301-73-21(B)(1), (2), and (9). The Board did not disagree with these findings.

{¶ 34} In addition, the ODE hearing officer found mitigating factors in the amount of time that had elapsed since Miller's last criminal activity in 1997, and in Miller's conduct and work activity after his misconduct, which included: Miller's employment with the same company for 12 years; Miller's volunteer work in his community schools and church; and the fact that Miller had fostered children in his home. The hearing officer also found evidence of rehabilitation required for persons with criminal convictions to be licensed under Ohio Adm. Code 3301-20-01. These findings related to Ohio Adm. Code 3301-73-21(B)(4), (5), and (8). The hearing officer concluded that the mitigating factors outweighed the aggravating factors, based on the amount of time that had elapsed since Miller's criminal conduct.

{¶ 35} As was noted, the Board disagreed with the amount of time Miller had been employed, and rejected the hearing officer's conclusion that the mitigating factors outweighed the aggravating factors. In particular, the Board relied on the significant amount of public funds involved; the extensive time period of the criminal conduct; the fact the crimes involved deceit, dishonesty, and obstruction of justice; Miller's involvement of subordinate officers; Miller's failure to disclose convictions on the application; and the fact that Miller's convictions and sentence reflected negatively on the teaching profession.

{¶ 36} While Miller's work with youth is commendable, we cannot say the trial court

abused its discretion in affirming the Board's decision.

{¶ 37} We have reviewed the entire record, including the testimony and exhibits presented at the hearing. We agree with Miller that any errors by the hearing officer concerning dates Miller was employed were insignificant. The record did indicate that Miller had been employed by the same company for around 10 or 11 years at the time of the hearing. The difference between these figures and 12 years is not important.

{¶ 38} Unfortunately, however, Miller's testimony minimized the seriousness of his convictions and sentence. While this is perhaps understandable, since Miller was obviously frustrated with the requirements for doing unpaid volunteer work, his testimony does reveal a tendency to discount his own conduct and responsibility – which militates against the idea of true rehabilitation. We say this for several reasons.

{¶ 39} First, despite having pled guilty to many serious charges, Miller maintained that he had not committed any crimes. Instead, Miller claimed, with respect to the California charges, that his mother and others were responsible for the crimes. According to Miller, his mother was a drug addict, and in an effort to assist her, he took her into his home and listed her as a dependent. This allowed her to access the California Air Force base facilities, and this access, in turn gave her the ability to sell drugs and engage in wrongdoing with Miller's civilian supervisor and others. The implication from this testimony, which was lacking in meaningful detail or documentation, is that Miller was blamed for stealing around $53,000 that his mother and others had actually stolen in California.

{¶ 40} Miller claimed that he pled guilty to these crimes because he wanted to protect his mother and prevent her from being sent to prison. While this is admirable in

theory, the charges to which he pled guilty did not state that he conspired with others to steal the money or that others stole money – the allegations in these charges and specifications specifically state that Miller stole various amounts of currency, and he was found guilty or pled guilty to the charges.[5]

{¶ 41} The vast bulk of the charges involving stolen money and attempts to steal money occurred in Ohio. Miller moved to Ohio after he had served at the California base; he did not indicate that his mother was living with him in Ohio or was involved with events that occurred in Ohio. The Ohio amounts included more than $418,000 that Miller was alleged to have stolen, as well as more than $501,000 that Miller was alleged to have tried to steal.

{¶ 42} Concerning these charges, Miller testified that after he arrived at the DFAS facility in Dayton, much confusion ensued because the Air Force had consolidated processing of vendor and contract payments into a few central locations like DFAS, rather than processing payments at each local base, as had been done previously. In the chaos resulting from consolidation, vendors were not being paid promptly. In order to help struggling vendors and get invoices paid, Miller apparently concocted a scheme of having vendors waive interest that they were due on late payments. According to Miller,

---

[5] As to whether there was a plea or trial, the record is somewhat unclear. Miller testified that he pled guilty, but the documents show that he pled not guilty and the "finding" was guilty. ODE's expert, Colonel Titus, testified that a trial would have taken place in this situation. Titus did concede that Miller could have initially pled not guilty and then entered into a plea bargain, similar to what occurs in the civilian world. Unfortunately, the record only contains the charges and findings, not what transpired during the court-martial proceeding. However, whether Miller pled guilty, or was tried and found guilty, is essentially irrelevant. In either case, he was convicted of the crimes. Furthermore, if Miller wished to admit additional documentation or witnesses to support his claim of innocence, he could have done so. Instead, he provided only his own testimony that he had not committed the crimes.

the money that he was accused of stealing and of attempting to steal consisted of the amounts of interest that had not been paid on these vendor invoices.

{¶ 43} Without disclosing the content of Ex. 9 (the confidential report from the Air Force Office of Special Investigations), we note that Miller's testimony is inconsistent with the report, which indicates that he was directly involved in theft.

{¶ 44} Miller testified that he pled guilty to these crimes because he was threatened with the possibility that his mother or wife could be sent to prison, and that it was time to "man up" and let his wife go on with her life. He also contended that the counsel the Air Force provided was ineffective.

{¶ 45} At the time Miller was sentenced, he had been in the Air Force for around 10 years, and had risen, with more than usual speed, to the rank of Technical Sergeant. He had a degree in finance and accounting, and it seems inconceivable that he would not have tried to obtain assistance from others in the chain of command with alleged vendor problems. Instead of doing so, or even presenting his case to a tribunal, Miller pled guilty to crimes he says he did not commit. Furthermore, the consequences were severe for Miller and his family: Miller received a reduction in rank, a dishonorable discharge, and a sentence of 12 years imprisonment, with no pay or benefits for his family. Again, Miller's testimony about his involvement was inconsistent with the report from the Office of Special Investigations.

{¶ 46} On the subject of his imprisonment, Miller, again, minimized his situation. Miller's brief claims that ODE's failure to acknowledge what really happened "defies common sense. The Agency continues to argue that Mr. Miller spent five years in a military prison when he actually spent three days." Brief of Appellant, p. 5.

**{¶ 47}** In his testimony, Miller stated that when he met with his attorney the day before his court-martial, he was under the impression that he was going to be on "military assignment" for 12 years. He then said he was sent to a "stockade" for three days and then went to Kansas, having been assigned there because he had an accounting and finance background. After an interview process, he was put in a managerial position in the kitchen.

**{¶ 48}** Miller further stated that after a few years in Kansas, he was sent to Washington State, where he was made the military's version of a trustee, and had full-base responsibility for lawn care. While Miller did admit that he was confined, his testimony consistently downplayed the experience.

**{¶ 49}** Ex. 10 reveals that the March 18, 1999 action reducing Miller's sentence from 12 years to nine years and six months was sent to Miller at the "U.S. Disciplinary Barracks" at Fort Leavenworth, Kansas. This exhibit also indicates that the July 2001 notice that Miller's sentence had been finally affirmed was sent to Miller at the "Regional Correction Facility," in Fort Lewis, Washington. Clearly, Miller was imprisoned for the entire period of time (July 1998 to 2004 or 2005), not simply for three days.[6]

C. Allowing Licensure for Persons with Criminal Convictions

**{¶ 50}** After concluding that Miller's mitigating factors outweighed the aggravating factors when evaluating his conduct under R.C. 3319.31 and Ohio Adm. Code 3301-73-21, the ODE hearing officer also considered whether Miller met the conditions in Ohio

---

[6] The documents furnished by the Air Force do not state when Miller was released, and Miller did not provide any documentation concerning a specific release date. Instead, Miller's testimony indicated that he was released in 2004 or 2005.

Adm. Code 3301-20-01(E), which allows licensure of persons "with certain criminal convictions and other alternative dispositions." Under this Code section, persons committing "absolute bar" offenses may not be issued licenses, but persons with other kinds of criminal convictions may be licensed. *See* Ohio Adm. Code 3301-20-01(B) and (E).

{¶ 51} Ohio Adm. Code 3301-20-01(D) provides that the Board may deem individuals convicted of offenses other than absolute bar offenses "rehabilitated" if they satisfy all conditions of a consent agreement or Board resolution. Subsection (E) imposes various further conditions, including: that the conviction is not one involving an absolute bar offense; that the victim of the offense was not under 18 years of age at the time of the offense; that five years have elapsed since the applicant was fully discharged from imprisonment, probation, or parole, if the offense was a felony; that the applicant is not a repeat offender; that the applicant furnishes written proof of rehabilitation; and that reasonable persons would find the applicant's licensure would not "jeopardize the health, safety, or welfare of the persons served by the district." Ohio Adm. Code 3301-20-01(E)(1)-(3).

{¶ 52} The ODE hearing officer concluded that Miller met the requirements in Ohio Adm. Code 3301-20-01(E)(1) and (2) because his convictions were not for an absolute bar offense and did not involve minors or students. The Board did not disagree with these conclusions.

{¶ 53} In addition, the ODE hearing officer held that Miller met the conditions in Ohio Adm. Code 3301-20-01(E)(3)(a) and (c) because he had been fully discharged more than five years previously, and he was not a repeat offender. The Board also did not

disagree with these findings.

{¶ 54} The ODE hearing officer then considered, pursuant to Ohio Adm. Code 3301-20-01(E)(3)(e), whether Miller's licensure would "jeopardize the health, safety, or welfare of the persons served by the district." This part of the regulation uses a "reasonable person standard," and lists eleven non-exclusive factors to be considered. These factors correspond to the 14 items listed in Ohio Adm. Code 3301-73-21(B) as aggravating and mitigating factors that the Board will take into consideration in deciding its final action in cases involving conduct unbecoming to an applicant's position.[7]

{¶ 55} In concluding that Miller's licensure would not jeopardize health, welfare or safety, the ODE hearing officer relied on her prior discussion of the aggravating and mitigating factors. However, the Board rejected this conclusion, as well as the hearing officer's recommendation that the Board grant Miller's application based on the fact that he was amenable to rehabilitation. In addressing these matters, the Board again relied on its own consideration of the aggravating factors, which indicated that Miller "would not be a positive role model for students and others in the school community * * *." Doc. #11, Admin. Appeal X, p. 28.

{¶ 56} We would disagree with the Board's comments if they had been made in a global sense. An individual's conviction of serious crimes does not mean he or she could not be rehabilitated or serve as a positive role model for others after serving the sentence. Furthermore, there is evidence in the record that Miller has been a positive influence on

---

[7] Ohio Adm. Code 3301-73-21(B) does contain three additional factors that relate to whether an individual has been previously disciplined by the Board or by other licensing entities, or has had a license or permit revoked. These three factors are not relevant to the case before us, as there was no indication that Miller had previously been disciplined by any licensing agency or had a license or permit that had been revoked.

youth in the area, through volunteer work as a youth director for his church, through volunteer work done for several years with the Dayton Early College Academy (a high school for inner city youth), and through his support of various troubled youth. Miller has also been steadily employed since his release from confinement in 2004-2005, and has had no apparent further misconduct since 1997. In view of these factors, we may have made a different decision, such as allowing Miller to reapply rather than permanently denying his eligibility to apply for any license issued by the Board. However, this is not our role, given our limited power of review.

{¶ 57} As noted by the Supreme Court of Ohio, " ' "[t]he fact that the court of appeals * * * might have arrived at a different conclusion than did the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so." ' " *Bartchy*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897 N.E.2d 1096, at ¶ 42, quoting *Rossford*, 63 Ohio St.3d at 707, 590 N.E.2d 1240. (Other citation omitted.)

{¶ 58} Based on our review of the record and applicable law, we cannot find an abuse of discretion in the trial court's finding that the Board's decision was supported by reliable, substantial, and probative evidence. As was noted, while Miller facially admitted responsibility, his testimony, in reality, blamed others and was inconsistent with information in the Air Force documents. Under the circumstances, one could reasonably question whether Miller was sufficiently rehabilitated at that point in time.

{¶ 59} Notably, Ohio Adm. Code 3301-20-01(F) states that applicants have the duty to provide evidence that the conditions for rehabilitation in Ohio Adm. Code 3301-20-01(E) have been met. This section of the regulation further stresses that "[i]f the

applicant fails to provide such evidence or if the district or the state board determines that the proof offered by the applicant is inconclusive or does not establish proof of rehabilitation, the applicant shall not be hired and the license shall not be issued. *Any doubt shall be resolved in favor of protecting the persons served by the district.*" (Emphasis added.) *Id.*

{¶ 60} We also reject Miller's contention that the Board misstated facts by indicating that Miller had involved subordinate officers in his crimes. According to Miller, there is "zero evidence" of this fact in the record. Appellant's Brief, p. 16. Contrary to this contention, ODE Ex. 9 indicates that Miller involved subordinates. Furthermore, Charge II, Specification 2, to which Miller pled guilty or was found guilty, alleges that Miller conspired with various Senior Airmen and an Airman First Class to falsify documents. This Specification also alleges that Miller improperly directed Senior Airmen to manipulate data in the Air Force Integrated Accounts Payable System. *See* ODE Ex. 10, pp. 5-6. According to ODE's expert witness, Senior Airmen and Airmen First Class are fairly young, junior, enlisted persons, and would have been in positions subordinate to Miller, who was a Sergeant. October 6, 2015 Hearing Transcript, pp. 144-145.

{¶ 61} As a final matter, we note Miller's argument that the hearing officer found his testimony credible, and that the Board erred in failing to give appropriate weight to the hearing officer's findings. A similar argument was made in *Bennett v. State Med. Bd. of Ohio*, 10th Dist. Franklin No. 10AP-833, 2011-Ohio-3158, ¶ 31. In that case, the Ohio State Medical Board concluded, based on the record and its experience, that a doctor was impaired. This was contrary to the hearing examiner's conclusion. *Id.* In rejecting the doctor's argument, the court of appeals commented that:

Although appellant correctly states that an administrative agency should accord due deference to a hearing examiner's findings and recommendations, especially where evidentiary conflicts exist, the standards of review do not change because an agency rejects its hearing examiner's recommendation. *Freeman v. Ohio Dept. of Human Servs.* (Dec. 14, 1995), 10th Dist. No. 95APE03-359, citing *Brown v. Ohio Bur. of Emp. Servs.*, 70 Ohio St.3d 1, 2, 635 N.E.2d 1230, 1994-Ohio-156, and *T. Marzetti Co. v. Doyle* (1987), 37 Ohio App.3d 25, 523 N.E.2d 347. The trial court was, therefore, tasked with determining whether the Board's order was supported by reliable, probative, and substantial evidence and was in accordance with law. This court's duty remains to determine whether the trial court abused its discretion in so concluding.

*Bennett* at ¶ 31.

{¶ 62} Consistent with this viewpoint, courts have held that error occurs when a hearing examiner's factual findings are " 'given deference over factual findings by the board, since, pursuant to R.C. 119.09, the board can make *de novo* factual findings if supported by the record * * *.' " *In re Certificate of Need Application of Providence Hosp.*, 67 Ohio App.3d 391, 398, 587 N.E.2d 326 (10th Dist.1990), quoting *Blinn v. Ohio Bur. of Emp. Serv.,* 29 Ohio App.3d 77, 80, 502 N.E.2d 665 (10th Dist.1985). "The ODE, as the ultimate decision maker, is not required to follow the recommendation of the hearing officer." (Citations omitted.) *Trout v. Ohio Dept. of Educ.*, 10th Dist. Franklin No. 02AP-783, 2003-Ohio-987, ¶ 17.

{¶ 63} Accordingly, our task is confined to deciding if the trial court abused its

discretion in finding that the Board's decision was supported by the sufficient degree of evidence. As was noted, we cannot find an abuse of discretion. Although evidentiary conflicts existed, the record contains substantial evidence supporting the Board's findings, and the trial court did not act unreasonably in affirming the Board's decision.

**{¶ 64}** Based on the preceding discussion, the First Assignment of Error is overruled.

### III. Was Miller Afforded Due Process?

**{¶ 65}** Miller's Second Assignment of Error states that:

> Appellant Was Seeking a Permit to Engage in Activity at a Public
>
> Institution and as Such Should Have Been Permitted Due Process.

**{¶ 66}** Under this assignment of error, Miller contends that ODE failed to provide him with due process. In this vein, Miller states that prior to the Board meeting, the ODE website indicated that the Board intended to issue a resolution approving the hearing officer's recommendation. As a result, neither Miller nor his attorney appeared at the Board's February 2016 meeting. Miller argues that if he had notice that the Board intended to propose a new resolution denying his application, he could have attended and pointed out the deficiencies in the proposed substitute resolution. Miller, therefore, maintains that he was deprived of due process.

**{¶ 67}** In response, ODE notes that the Board does not allow respondents to address the Board during its meetings. ODE also points out that Miller was notified of the Board meeting and chose not to attend. ODE, therefore, argues that Miller received all process to which he was due.

**{¶ 68}** The trial court noted the parties' respective positions about Miller's ability to

address the Board, but did not comment directly on "due process." Nonetheless, we find no reversible error.

{¶ 69} As a preliminary matter, Miller's argument is based partly on facts that are not in the record. There is no evidence in the record regarding what was or was not on the Board's website at the time, and we cannot consider these matters. It is well-established that " '[a] reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.' " *Taylor v. Taylor*, 2d Dist. Miami No. 2012-CA-16, 2013-Ohio-2341, ¶ 19, quoting *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus.

{¶ 70} As a general rule, "[b]oth the Fourteenth Amendment of the United States Constitution and Section 16, Article I, of the Ohio Constitution require that administrative proceedings comport with due process." *Kellough v. Ohio State Bd. of Edn.*, 10th Dist. Franklin No. 10AP-419, 2011-Ohio-431, ¶ 36, citing *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and *Doyle v. Ohio Bur. of Motor Vehicles*, 51 Ohio St.3d 46, 554 N.E.2d 97 (1990). "To comply with the requirements of procedural due process, administrative agencies must, at a minimum, provide notice and an opportunity for a hearing before depriving individuals of their protected liberty or property interests." *Id.*, citing *Cleveland Bd. of Edn. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). (Other citations omitted.)

{¶ 71} Regarding due process, R.C. 119.06 states that "[n]o adjudication order shall be valid unless an opportunity for a hearing is afforded in accordance with sections 119.01 to 119.13 of the Revised Code." Consistent with this admonition, R.C. 119.07

provides that "in all cases in which section 119.06 of the Revised Code requires an agency to afford an opportunity for a hearing prior to the issuance of an order, the agency shall give notice to the party informing the party of the party's right to a hearing." Notice of the hearing is to be sent by registered mail, and the notice must also contain various items, including information about the charges and that the party is entitled to a hearing if a request is filed within 30 days. *Id.*

{¶ 72} Miller does not allege that he failed to receive proper notice of the ODE charges or of his right to a hearing on the charges, nor does he contend that ODE failed to comply with any notice and hearing requirements contained in R.C. 119.07. In fact, Miller received notice and availed himself of the right to a hearing on the charges against him.

{¶ 73} As part of the process afforded, R.C. 119.09 requires referees or examiners to submit written reports setting forth findings of fact and conclusions of law, as well as a recommendation. After receiving the report, the parties are entitled to file objections, which the agency must consider "before approving, modifying, or disapproving the recommendation." *Id.* Consistent with the process outlined in R.C. 119.09, the hearing officer filed a report, which was sent to Miller. *See* Doc. #11, Admin. Appeal R. Miller was also informed of his right to file written objections within 10 days of receipt of the report. *Id.*

{¶ 74} Another part of the process involves post-hearing procedure. In this regard, R.C. 119.09 further provides that:

The agency may order additional testimony to be taken or permit the introduction of further documentary evidence. The recommendation of the

referee or examiner may be approved, modified, or disapproved by the agency, and the order of the agency based on such report, recommendation, transcript of testimony and evidence, or objections of the parties, and additional testimony and evidence shall have the same effect as if such hearing had been conducted by the agency. No such recommendation shall be final until confirmed and approved by the agency as indicated by the order entered on its record of proceedings, and if the agency modifies or disapproves the recommendations of the referee or examiner it shall include in the record of its proceedings the reasons for such modification or disapproval.

{¶ 75} The clear wording of the statute reveals that R.C. 119.09 does not require agencies to take additional evidence, nor does it require agencies to provide parties with further opportunities to address the agency beyond attending the proceedings before the hearing officer. Whether these items could occur is completely discretionary. Likewise, Ohio Adm. Code 3301-73-20(E), which addresses the Board's consideration of a hearing officer's report and recommendation, does not provide for input by the parties during Board meetings. Consistent with the regulation and statute, the Board considered the hearing officer's report and included its reasons for rejecting the report.

{¶ 76} In support of his argument, Miller relies on R.C. 121.22(F), which, according to Miller, requires ODE to post agendas prior to its meetings, so that members of the public can ascertain the nature of the business to be conducted and decide if they need to attend the meeting. According to Miller, if the Board decides to conduct "new business" (presumably referring to amendment of a resolution), it should table the matter

until its next hearing. Miller argues that if this had been done, he could have addressed the Board.

{¶ 77} R.C. 121.22 requires meetings of public bodies to be open, with certain exceptions (not applicable here), and for notice of meetings to be provided. R.C. 121.22(F) states that:

Every public body, by rule, shall establish a reasonable method whereby any person may determine the time and place of all regularly scheduled meetings and the time, place, and purpose of all special meetings. * * *

The rule shall provide that any person, upon request and payment of a reasonable fee, may obtain reasonable advance notification of all meetings at which any specific type of public business is to be discussed. Provisions for advance notification may include, but are not limited to, mailing the agenda of meetings to all subscribers on a mailing list or mailing notices in self-addressed, stamped envelopes provided by the person.

{¶ 78} In compliance with this rule, ODE has provided several methods for learning the time and place of all regularly scheduled Board meetings. *See* Ohio Adm. Code 3301-4-01(A)(1)-(3), which indicates that information can be obtained by writing to the Secretary of the Board, by contacting ODE's office of board relations by phone or email, or by checking meeting notices on ODE's website. Again, neither the statute nor the regulation require the Board to allow parties to defend their appeals during Board meetings.

{¶ 79} Furthermore, the Board has adopted a "Policies and Procedures Manual"

that is available on the ODE website. The manual contains the following comments about public participation at Board meetings:

I. Public Participation

Except for executive session, meetings are open to the public. Members of the public have opportunities to address the State Board during Chapter 119 hearings and during the business meeting. Members of the public who wish to address the State Board on agenda items scheduled for a vote at the current meeting will be permitted to address the State Board before the casting of any vote. Individuals who wish to address the State Board on issues of general interest or items not scheduled for a vote at the current meeting will be permitted to address the State Board following the voting on items of business at that meeting. In either instance, the individual may speak for a period not to exceed five minutes. The president may impose further limitations on public participation as deemed appropriate or necessary.

No person, including attorneys representing their parties, will be permitted to address the State Board on any matter that may be or is the subject of an administrative hearing under the provisions of ORC Chapter 119, or other statute or rule, unless all related legal proceedings have concluded.

http://education.ohio.gov/getattachment/State-Board/State-Board-Reports-and-Policies/Current_May-2017-Policies-Procedures-Manual.pdf.aspx, p. 15.

{¶ 80} Accordingly, neither Miller nor his attorney would have been allowed to

address the Board, since the legal proceedings involving his case had not concluded. This was not a deprivation of due process, since no statute or regulation requires the Board to give litigating parties an opportunity to speak at that level. Miller had ample opportunity to present his position at the hearing, and to file objections, if he were dissatisfied with the hearing officer's decision. The statutes and regulations do not require more.

{¶ 81} In light of the preceding discussion, the Second Assignment of Error is overruled.

## IV.   Conclusion

{¶ 82} All of Miller's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

David M. Duwel
Adam P. Bessler
Hon. Gregory F. Singer